UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:    3/16/2026

| | |
|---|---|
| KYLE BRAGG, *as Trustee*, BUILDING SERVICES 32BJ PENSION FUND, BUILDING SERVICE 32BJ LEGAL SERVICES FUND, BUILDING SERVICE 32BJ THOMAS SHORTMAN TRAINING, SCHOLARSHIP, AND SAFETY FUND, and BUILDING SERVICE 32BJ SUPPLEMENTAL RETIREMENT AND SAVINGS PLAN, | 24-cv-7725 (MKV) |

Petitioners,

-against-

TRIANGLE SERVICES, INC,

Respondent.

OPINION AND ORDER
GRANTING MOTION TO
CONFIRM ARBITRATION
AWARDS AND DENYING
CROSS-MOTION TO VACATE

MARY KAY VYSKOCIL, United States District Judge:

Petitioners Kyle Bragg, as Trustee and the Trustees of the Building Service 32BJ Health Fund, Building Service 32BJ Pension Fund, Building Service 32BJ Legal Services Fund, Building Service 32BJ Thomas Shortman Training, Scholarship, and Safety Fund, and Building Service 32BJ Supplemental Retirement and Savings Plan (collectively the "Funds" or "Petitioners") move to confirm two arbitration awards against Respondent Triangle Services, Inc. (the "Employer" or "Respondent") pursuant to collective bargaining agreements [ECF Nos. 25, 26, 27, 28, 33]. Respondent cross-moves to vacate the awards [ECF Nos. 29, 30, 31, 32]. For the reasons set forth below, Petitioners' motion to confirm the awards is GRANTED, and Respondent's cross-motion to vacate the awards is DENIED.

1

## I.    BACKGROUND

### A. Facts[1]

Petitioners are trustees of trust funds organized pursuant to the Taft-Hartley Act of 1947. *See* 56.1 ¶¶ 1–2; Counter 56.1 ¶¶ 1–2.  The Funds are established pursuant to collective bargaining agreements and exist to, *inter alia*, collect contributions from employers and distribute benefits to employees.  *See* 2016 CBA at 27–40; 2020 CBA at 30–44.  Respondent is a New York for-profit corporation that "provides custodial and security services" in many New York City buildings. LoBasso Decl. ¶ 10; 56.1 ¶ 3; Counter 56.1 ¶ 3.  At all relevant times, Respondent was a party to collective bargaining agreements with the Service Employees International Union, Local 32BJ (the "CBAs"), which CBAs "appl[ied] to all service employees" in its buildings.[2]  2016 CBA at 2; 2020 CBA at 2; 56.1 ¶ 4; Counter 56.1 ¶ 4.

The CBAs require Respondent to "notify the Union . . . of each new employee" and to make regular contributions to the Funds on behalf of its eligible employees.  2016 CBA at 10; 2020 CBA at 10; 56.1 ¶ 4; Counter 56.1 ¶ 4.  The CBAs also govern, among other things, which of Respondent's employees are covered by the CBA and eligible for contributions.  In particular, as pertinent here, the CBAs recognize a category of "vacation replacement" workers.  2016 CBA

---

[1] The facts are taken from the arbitration awards [ECF Nos. 30-1 (the "First Award"), 30-8 (the "Second Award")] and the parties' submissions.  *See Squarepoint Ops LLC v. Sesum*, No. 19-cv-7317 (LAP), 2020 WL 996760, at *1 (S.D.N.Y. Mar. 2, 2020) (explaining that, in resolving cross-petitions to confirm and vacate an arbitration award, the "facts are taken from the Award and each party's submission.").  The pertinent submissions include: the two relevant collective bargaining agreements, which are substantially identical as relevant to this dispute [ECF Nos. 1-1 (the "2016 CBA"), 1-2 (the "2020 CBA") (collectively, the "CBAs")], the petitions to confirm the arbitration awards [ECF No. 1-6 (the "First Petition"); ECF No. 28-6 (the "Second Petition")], the responses to the petitions [ECF Nos. 9, 26-9], the parties' Local Civil Rule 56.1 Statements [ECF Nos. 28 ("56.1"), 31 ("Counter 56.1")], the Affidavit of Ira A. Sturm [ECF No. 26 ("Sturm Decl.")], the exhibits attached thereto, and the Declaration of Steve Lobasso [ECF No. 30 ("Lobasso Decl.")] and the exhibits attached thereto.

[2] Before the Arbitrator and earlier in this litigation, Respondent argued that there was no evidence that it had signed the CBA.  *See* Lobasso Decl. ¶ 11.  However, Respondent has withdrawn this argument [ECF No. 26-10].  *See* Counter 56.1 ¶ 4.

at 106; 2020 CBA at 103.  The key provision states:

> ***A person hired solely for the purpose of relieving employees for vacation*** shall be paid sixty percent (60%) of the minimum applicable regularly hourly wage rate. Should a vacation relief employee continue to be employed beyond five (5) months, such employee shall be paid the wage rate of a new hire or experienced person, as the case may be. If a vacation replacement is hired for a permanent position immediately after working as a vacation replacement, such employee shall be credited with time worked as a vacation replacement toward completion of the thirty (30) or forty-two (42) month period, whichever applies, required to achieve the full rate of pay under the "New Hires" provision.

> ***In the event that the Arbitrator finds that an Employer is using this rate as a subterfuge***, such Arbitrator may, among other remedies, award full pay from the date of employment at the applicable hiring rate.

> No contributions to any Benefit Funds shall be made for a vacation relief person. Vacation relief persons are not eligible for 32BJ Benefit Fund coverage.

2016 CBA at 105–06 (emphases added); 2020 CBA at 103–04 (emphases added).

The CBAs also include several pertinent provisions concerning security guards.  At the outset, the CBAs provide: "All security employees shall be covered by this Agreement unless the Union and the Employer execute a separate collective bargaining agreement covering security guards."  2016 CBA at 3; 2020 CBA at 2.  In a definitions section, the CBAs state:

> *Guard* - An employee whose function is to enforce rules to protect the property of the Employer or to protect the safety of persons on the Employer's premises and whose duties shall not include the work performed under any other job classification covered in this Agreement.

2016 CBA at 124; 2020 CBA at 123.

Relevant to this case, the CBAs provide for an audit when the Employer is "delinquent" in making payments.  2016 CBA at 133; 2020 CBA at 132.  Similarly germane, the CBAs contain a broad arbitration clause.  *See* 56.1 ¶ 4; Counter 56.1 ¶ 4.  The arbitration clause provides that the "Contract Arbitrator" shall "decide all differences arising between the parties as to interpretation, application or performance of any part of this Agreement."  2016 CBA at 17; 2020 CBA at 19.  It

3

further provides that arbitration in accordance with the CBAs "shall be the sole and exclusive method for the determination of all such issues."  2016 CBA at 19; 2020 CBA at 21.

It is undisputed that the Funds caused an audit of Respondent to be conducted for a period from 2016 to 2019 (the "First Audit").  56.1 ¶ 5; Counter 56.1 ¶ 5.  The parties agree that Respondent cooperated with that audit by providing the auditor with requested records.  56.1 ¶ 5; Counter 56.1 ¶ 5.  In connection with the First Audit, the auditor found that Respondent owed unpaid contributions on behalf of employees whom Respondent had classified as vacation replacements and on behalf of security guards at one of Respondent's buildings.  *See* LoBasso Decl., Ex. 3 (the "First Audit Report"); 56.1 ¶ 5; Counter 56.1 ¶ 5; First Award at 2–3.

It is undisputed that Respondent did not pay the contributions identified in the First Audit Report, instead challenging the auditor's analysis, and the Funds demanded arbitration.  56.1 ¶ 5; Counter 56.1 ¶ 5.  The Arbitrator held multiple hearing over the course of approximately a year and a half, and both parties fully participated in the arbitration.  *See* 56.1 ¶¶ 6, 7; Counter 56.1 ¶¶ 6, 7.  Thereafter, the parties agree, the Arbitrator issued an award in favor of the Funds, directing Respondent to pay $1,550,900.09 in unpaid contributions, $908,614.40 in interest, $310,180.02 in liquidated damages, $52,218.75 in attorney's fees, and the cost of the arbitration [ECF No. 30-1 (the "First Award") at 54].  *See* 56.1 ¶¶ 8, 9; Counter 56.1 ¶¶ 8, 9.

In a 54-page document, the Arbitrator discussed in detail the parties' disputes regarding contributions for vacation replacements and security guards, the relevant contract language,[3] and evidence the parties had presented during the arbitration.  The Arbitrator ruled that, while the CBA does not provide for coverage and contributions for vacation replacements, Respondent had "wrongly categorized" individuals as vacation replacements who "should have been categorized"

---

[3] Given the timeframe of the First Audit, the First Award deals only with the 2016 CBA.

as service employees. First Award at 37; *see id.* at 36–42. The Arbitrator ruled that Respondent had violated the CBA by failing to "notify[] the Union of employees who performed service work" and owed contributions for the misclassified employees. *Id.* at 37, 47.

The Arbitrator expressly weighed and rejected Respondent's attacks on the auditor's analysis in this regard. *See id.* at 44–47. The Arbitrator further found that Respondent's "system regarding vacation replacements" constituted "subterfuge" within the meaning of the CBA. *Id.* at 48–49. Specifically, Respondent argued before the Arbitrator that the auditor had used "unwritten rules," not based in the CBA, to find that employees were being improperly classified as vacation replacements. *Id.* at 45. In particular, the auditor found that employees were misclassified because Respondent would employ so-called vacation replacements for four months or 150 days (just shy of the 5-month mark at which the CBA specifies that they must be treated as employees), give them a 30-day break in service, and rehire them. *See id.* at 15, 28, 29, 39, 40. Respondent argued that this practice was legitimate, but the Arbitrator ruled that it violated the CBA and constituted the "subterfuge" contemplated by the CBA. *See id.* at 38–42, 44–47, 48–49.

The Arbitrator stressed that the CBA expressly provides that properly classified vacation replacements must be "hired *solely* for the purpose of relieving employees for *vacation*;" however, Respondent could not "match" its so-called vacation replacements to "relieved employee[s]." *Id.* at 41–42 (emphases added). Moreover, the Arbitrator cited testimony from Respondent's "Day Operations Manager" that "vacation replacements were used all year round because 'You always need Vacation Replacements if employees are *hurt* or *sick* or on vacation.'" *Id.* at 16 (emphases added); *see id.* at 45. The Arbitrator also cited testimony that Respondent's "practice" was not to employ any vacation replacement for too long "because if so, we had to pay them benefits." *Id.* at 15–16; *see id.* 45–46. As such, if the vacation replacements "were good workers" the "practice

5

was to 'lay [them] off' . . . for 30-45 days, and then rehire the same individuals." *Id.* at 16; *see id.* at 40–41.    Indeed, the Day Operations Manager testified, "during this layoff break, some employees were sent to work in other affiliated Triangle companies that are not party to the CBA." *Id.; see id.* at 40–41.

The Auditor found that Respondent had likewise violated the CBA with respect to security guards. *See id.* at 42–43.  As the auditor explained, Respondent's principal argument was that the guards in its building were not covered by the CBA because, under the National Labor Relations Act ("NLRA"), security guards may not be included in the same collective bargaining unit with non-guard employees. *Id.* at 24.  However, the Arbitrator stressed that the relevant CBA expressly includes "security employees." *Id.* at 42 (quoting 2016 CBA at 3); *see id.* at 43 n.12 (citing *Bevona v. American Bldg. Maint., Inc.*, 1996 WL 304547, at *1 (S.D.N.Y. June 6, 1996) (explaining that, under the NLRA, "an employer cannot be compelled to recognize a mixed guard union" but "may voluntarily recognize a mixed guard union")).  The Arbitrator found that the relevant employees also fell within another category of "Other[]" covered employees. *Id.* at 43.

The parties agree that Respondent has refused to comply with the First Award.  56.1 ¶ 13; Counter 56.1 ¶ 13.

It is also undisputed that the Funds demanded a second arbitration about Respondent's refusal to cooperate with a second audit.  56.1 ¶ 14; Counter 56.1 ¶ 14.  Respondent argued that the second audit should be held in abeyance in light of the parties' unresolved dispute over the first audit [ECF No. 30-8 (the "Second Award") at 5].  LoBasso Decl. ¶ 26 (describing Respondent's "position that the audit should be held in abeyance until the issues in the first audit were resolved"); *see* 56. ¶ 16; Counter 56.1 ¶ 16.  The Arbitrator directed Respondent to cooperate in the second audit, citing the 2020 CBA and "the Funds' collection policies to which [Respondent] is

6

contractually bound." Second Award at 3, 8–9.

According to Petitioners, to date, Respondent has provided "some records" for 2024 but "no data ha[s] been provided" to the auditor "through 2023." Sturm Aff. ¶ 5.

## B.  Procedural History

Petitioners initiated an action to confirm the First Award in the Supreme Court of New York, County of New York, and Respondent removed that action to this Court [24-cv-7725, ECF Nos. 1, 1-6]. Thereafter, Petitioners filed an action in this Court to confirm the Second Award [25-cv-62, ECF No. 1]. The Court thereafter issued an Order consolidating the cases and directing Petitioners to file a consolidated motion to confirm both awards [ECF No. 24].

In accordance with the Court's Order, Petitioners filed a motion to confirm their awards, a memorandum of law, a statement of facts pursuant to Local Civil Rule 56.1, an affirmation of counsel, and a number of exhibits [ECF Nos. 25, 26, 27 ("Mem."), 28]. Respondents filed a cross-motion to vacate the awards, a memorandum of law in support of that cross-motion and in opposition to Petitioners' motion, a counterstatement pursuant to Rule 56.1, a declaration of counsel, and exhibits [ECF Nos. 29 ("Opp."), 30, 31, 32]. Petitioners filed a reply brief in further support of their motion [ECF No. 33].

## II.     LEGAL STANDARD

After an arbitration award issues, Section 9 of the Federal Arbitration Act ("FAA") permits a party to petition a district court for an order confirming the award. *See STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 74 (2d Cir. 2011); 9 U.S.C. § 9. "Normally, confirmation of an arbitration award is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'" *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)). The

district court "must grant" a petition to confirm an award, 9 U.S.C. § 9, unless the opposing party can show that it "falls within a very narrow set of circumstances delineated by statute and case law" that permit a district court to vacate or modify the award, [4] *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003). "A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." *D.H. Blair & Co.*, 462 F.3d at 110.

It well established that courts must be "extremely deferential" to an arbitrator's decision. *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007); *see Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013). Indeed, a court must confirm the award if there is any "barely colorable justification for the outcome reached" by the arbitrator. *D.H. Blair & Co.*, 462 F.3d at 110 (quoting *Landy Michaels Realty Corp. v. Local 32B–32J, Service Employees Int'l Union*, 954 F.2d 794, 797 (2d Cir. 1992)). "Because the parties 'bargained for the arbitrator's construction of their agreement," an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." *Oxford Health Plans*, 569 U.S. at 569 (quoting *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)). Such "severely limited" judicial review is necessary to maintain the essential virtues of arbitration, "namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (first quoting *ReliaStar Life Ins. Co. v. EMC Nat. Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009)

---

[4] Pursuant to Section 10 of the FAA, a district court may vacate an arbitration award if (1) the award was procured by corruption or fraud, (2) the arbitrator was evidently corrupt or biased, (3) the arbitrator was guilty of certain prejudicial misconduct, or (4) the arbitrator exceeded his powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a)(1)-(4). In the Second Circuit, an award can also be vacated for "manifest disregard" of the law in "exceedingly rare instances" of "egregious impropriety." *Duferco*, 333 F.3d at 389. Pursuant to Section 11, a district court may modify an award if (1) there was an evident material miscalculation, (2) the arbitrator awarded upon a matter not submitted to arbitrations, or (3) the award is imperfect in matter of form not affecting the merits. 9 U.S.C. § 11(a)-(c).

and then quoting *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008)).

### III.    <u>DISCUSSION</u>

The Court must confirm both the First Award and the Second Award.  *See* 9 U.S.C. § 9; *D.H. Blair & Co.*, 462 F.3d at 110.  With respect to the First Award, Respondent strenuously disagrees with the Arbitrator's rulings that Respondent violated the CBA by failing to notify the Union of, and make contributions for, employees that Respondent had classified as vacation replacements, engaged in subterfuge with respect to these so-called vacation replacements, and violated the CBA by failing to notify the Union of and make contributions for certain security guards.  Although Respondent attempts to dress up its arguments in the language of the Arbitrator exceeding his power, Respondent simply disagrees with the Arbitrator's interpretation of the CBA, which the Arbitrator indisputably interpreted and applied.  *See Oxford Health Plans*, 569 U.S. at 569.  Respondent bargained for the Arbitrator's interpretation of the CBA and is bound by the Arbitrator's decision.  *See id.*; 2016 CBA at 17.

Respondent argues that the Second Award should be vacated because the "scope of the Second Audit necessarily depends on whether the vacation replacements and security guards are included or excluded."  Opp. at 20.  Citing a single, inapposite district court opinion, Respondent asserts the Arbitrator's failure to adjourn the second arbitration pending this Court's resolution of that dispute was an abuse of discretion.  *Id.* (citing *Allendale Nursing Home, Inc. v. Local 1115 Joint Bd.*, 377 F. Supp. 1208, 1213 (S.D.N.Y. 1974)).  Respondent clearly fails to meet its high burden to show that the Second Award should be vacated, and, as such, the Second Award must also be confirmed.  *See D.H. Blair & Co.*, 462 F.3d at 110.

**A. The First Award Must Be Confirmed.**

1. <u>Vacation Replacements</u>

Respondent argues that the First Award is "fatally flawed because the collective bargaining agreement relied upon by the Funds expressly excluded the disputed employees from contributions and benefit coverage." Opp. at 1; *see id.* at 9–16. In particular, Respondent stresses that the 2016 CBA establishes a category of vacation replacements and specifies that such employees are not eligible for benefits coverage and contributions. Opp. at 12 (citing 2016 CBA at 105–06). The Arbitrator expressly addressed this argument and, based on his textually-supported interpretation of the contract language and the evidence before him, ruled that Respondent had "wrongly categorized" employees as vacation replacements. First Award at 36–37.

Contrary to Respondent's wishful thinking, the CBA does not provide that any employee whom Respondent deems a vacation replacement and employs for a limited time is excluded from coverage and contributions. On the contrary, as the Arbitrator underscored, the CBA expressly provides that individuals falling within the excluded category must be "hired *solely* for the purpose of relieving employees for *vacation*." 2016 CBA at 105 (emphases added); *see* First Award at 36–37. The Arbitrator was well within his power to rule that Respondent had misclassified so-called vacation replacements in light of the evidence that such individuals were employed "all year round" in case any employee was "*hurt* or *sick* or on vacation," and there was no "match" between each purported vacation relief worker and the relieved employee. First Award at 15–16, 36–42 (emphases added). The Arbitrator clearly was "construing or applying the contract" and provided justifications for his conclusion. *Oxford Health Plans*, 569 U.S. at 569.

Respondent is adamant that its practice of laying off and rehiring so-called vacation replacements is legitimate under the terms of the CBA. *See* Opp. at 4–5. However, having already

ruled that Respondent's so-called vacation replacements do not meet the CBA definition, the Arbitrator was within his power to rule further that Respondent had engaged in subterfuge within the meaning of the CBA. *See* First Award at 47–49. The term subterfuge is not defined by the CBA, but the CBA expressly empowers "the Arbitrator" to "find[]" that the Employer engaged in subterfuge with respect to vacation replacements. 2016 CBA at 106. Respondent bargained for the Arbitrator's interpretation of the term subterfuge, and "must now live with that choice." *Oxford Health Plans*, 569 U.S. at 573.

The Arbitrator reasonably ruled that the "subterfuge" contemplated by the CBA included Respondent's "intentional and deliberate, not merely neglectful," practices with respect to vacation replacements. First Award at 48. Specifically, the Arbitrator stressed that Respondent not only failed to notify the Union when it hired vacation replacements but also "took the positive action of creating" a separate account (its "business unit #400002 system") for vacation replacements, which was "unsuitable for meeting the need for adequate record keeping." *Id.* at 49. In particular, the Arbitrator stressed that this separate system "could not provide information regarding the sole use of the vacation replacements for replacing vacationing employees." *Id.*

Relatedly, the Arbitrator rejected Respondent's complaints about the auditor's "proper use of analytical tools" to find that Respondent had a practice of misclassifying service employees as vacation replacements. *Id.* at 45. The Auditor cited testimony that Respondent had a practice of *supposedly* laying off vacation replacements before the 5-month mark and soon thereafter rehiring them "*because*" Respondent sought to avoid treating these individuals as covered employees eligible for contributions. *Id.* at 15–16; *see id.* 40–41, 45–46. Indeed, the Arbitrator cited further testimony that "during this layoff break, some employees were sent to work in [Respondent's] other affiliated . . . companies that are not party to the CBA." *Id.* at 16; *see id.* 40–41, 45–46. The

11

Court must defer to the Arbitrator's reasonable conclusion that, in light of the evidence of these practices, Respondent engaged in subterfuge with respect to vacation replacements. *See Porzig*, 497 F.3d at 139; *Oxford Health Plans*, 569 U.S. at 569.[5]

### 2. Security Guards

The Arbitrator ruled that Respondent violated the CBA by failing to notify the Union of, and make contributions on behalf of, the security guards at a certain building. *See* First Award at 42–43. Respondent argued before the Arbitrator, and argues here, that those individuals already worked as non-union employees at that building when it was managed by another company, and Respondent thereafter won the contract to manage the building and simply continued to employ those security guards as non-union employees. *See* Opp. at 8; First Award at 42. However, as the Arbitrator correctly observed, the CBA expressly provides that "[a]ll security employees shall be covered by this Agreement unless the Union and the Employer execute a separate collective bargaining agreement." First Award at 42 (quoting 2016 CBA at 3).[6] Respondent did not have a separate collective bargaining agreement with the security guards it admits it employed as non-union employees. *See* Opp. at 8. As such, the Arbitrator was well within his authority to rule that

---

[5] Respondent also argues that the Arbitrator erred by rejecting and excluding certain evidence. *See* Opp. at 13, 18–19. In particular, first, Respondent had argued to the Arbitrator that, in the past, auditors and the Union had accepted Respondent's treatment of vacation replacements, but the Arbitrator rejected this "past practice" argument on the ground that the Funds had first discovered the "show system of business unit #400002" during the First Audit at issue here. First Award at 44. Similarly, Respondent argues that the Arbitrator improperly excluded evidence that the Union was aware of Respondent's treatment of vacation replacements and the particular security guards at issue and "never made an objection, never filed a grievance or otherwise challenged" Respondent's practices. *Id*. at 31. The Arbitrator excluded this evidence as "irrelevant" because, the Arbitrator ruled, the contract was clear and unambiguous and "it is the Funds, not the Union," who seek contributions pursuant to the CBA. *Id*. at 48. "It is well settled that procedural questions that arise during arbitration, such as which witnesses to hear and which evidence to receive or exclude, are left to the sound discretion of the arbitrator and should not be second-guessed by the courts." *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 545 (2d Cir. 2016). As such, the Court rejects Respondent's argument that the Arbitrator improperly excluded evidence.

[6] The Arbitrator also ruled, in the alternative, that the employees in question fall within a category of "Other[]" covered employees. First Award at 43.

12

Respondent violated the CBA with respect to these guards, and the Court must defer to that ruling. *See Oxford Health Plans*, 569 U.S. at 569; *Porzig*, 497 F.3d at 139.

Respondent challenges the Arbitrator's ruling on that ground that "despite knowledge of their non-union status, neither the Union nor the Security Guards ever made any objection, grievance or other claim that these Security Guards should have been covered under a Local 32BJ labor agreement." Opp. at 8. However, the Arbitrator ruled that any evidence of the Union's knowledge was irrelevant because the CBA is unambiguous and Respondent's dispute is with the Funds. *See* First Award at 48. The Court may not second-guess that evidentiary ruling. *See Nat'l Football League Mgmt. Council*, 820 F.3d at 545. There is no basis for this Court to question the Arbitrator's text-based ruling that the guards in question were covered by the CBA and, as such, Respondent owes unpaid contributions. *See D.H. Blair & Co.*, 462 F.3d at 110.

Accordingly, for the reasons set forth above, the Court "must grant" Petitioner's motion to confirm the First Award, 9 U.S.C. § 9, because Respondent has failed to meet its heavy burden to show that this case falls within any of the narrow circumstances in which the Court has authority to vacate that award, *see Duferco Int'l Steel Trading*, 333 F.3d at 388.

## A. The Second Award Must Be Confirmed.

The Second Award likewise must be confirmed. Respondent's sole argument for vacating the Second Award is that, it asserts, the Arbitrator was required to adjourn the Second Arbitration until this Court ruled on Respondent's challenge to the First Award. *See* Opp. at 20. To be sure, by statute, a court may vacate an arbitration award "where the arbitrators were *guilty of misconduct* in refusing to postpone the hearing, upon sufficient cause shown," or other "misbehavior" that prejudiced a party to the arbitration. 9 U.S.C. § 10(a)(3) (emphasis added). In support of the proposition that this statutory provision applies to this case, Respondent cites a single, inapposite

13

district court opinion, *Allendale Nursing Home, Inc. v. Local 1115 Joint Board*, 377 F. Supp. 1208 (S.D.N.Y. 1974). *See* Opp. at 20. In that case, the court ruled that the arbitrator had abused his discretion by refusing to adjourn a hearing to accommodate a "bona fide and serious illness," after having granted multiple adjournments at the other party's request. *Allendale Nursing Home*, 377 F. Supp. at 1213, 1214.

Here, the Arbitrator did not engage in any misconduct or misbehavior. 9 U.S.C. § 10(a)(3). Rather, the Arbitrator reasonably ruled that Second Audit should proceed because he had already ruled on the disputes about the vacation replacements and the security guards in the First Award, and the FAA exists to "promote the expeditious resolution of claims" where, as here, parties have "privately made agreements to arbitrate." Second Award at 8. The Arbitrator was clearly correct. *See Scandinavian Reinsurance*, 668 F.3d at 71–72 (2d Cir. 2012).

As such, the Court "must grant" Petitioner's motion to confirm the Second Award, 9 U.S.C. § 9, since Respondent has failed to show that this case falls within any of the narrow circumstances in which the Court has authority to vacate it, *see Duferco Int'l Steel Trading*, 333 F.3d at 388.

### IV.   <u>CONCLUSION</u>

For the reasons set forth above, Petitioner's motion to confirm the First Award and the Second Award is GRANTED, and Respondent's motion to vacate is DENIED.

The Clerk of Court respectfully is requested to terminate the motions at docket entries 25 and 32 and to close this case.

**SO ORDERED.**

**Date:  March 16, 2026**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**